The plaintiff, Peter M. Brant, has filed an amended application for prejudgment remedy dated May 20, 1992. The plaintiff seeks to attach three parcels of real property of the defendant, Jack D. Grassi, to secure the sum of $1,400,000.00.
The defendants, Jack D. Grassi and Grassi Oldsmobile Cadillac, Inc., have also filed an application dated May 20, 1992, for a prejudgment remedy to attach real property in the amount of $3,100,000.00 on the basis of their counterclaim filed in this action. CT Page 5670
The dispute stems from the failure to close on a contract for the purchase of commercial property in the Town of Greenwich and the related purchase of an automobile dealership.
The plaintiff is a businessman engaged, inter alia, in the purchase and development of commercial properties. The defendant, Jack D. Grassi, is the owner of the commercial property located at 53-55 West Putnam Avenue. He is the president of the other defendant, Grassi Oldsmobile Cadillac, Inc., a car dealership located at that address.
On November 1, 1989, the plaintiff, Peter Brant, and the defendant, Jack Grassi, entered into an agreement under which the plaintiff would purchase the West Putnam Avenue real property for a price of $4,500,000.00, of which $1,000,000.00 was paid down at the signing of the agreement. The final closing was to take place on the third anniversary of the agreement, although the defendant could advance the closing upon six months notice to the defendant.
At approximately the same time, the plaintiff entered into a contract with the defendants to purchase the assets of the Cadillac dealership (exclusive of the Oldsmobile portion), should the seller exercise an option to sell, for a price of $1,000,000.00 plus the cost of the inventory. A down payment of $100,000.00 against the purchase price, to be held in escrow by the defendants' attorney, was to be made to the defendants when the option to sell was exercised. The closing on this contract was to occur at the same time the real property sale was closed.
The defendant Grassi notified the plaintiff in a writing dated January 25, 1990, that the option to sell the dealership and consequently to advance the closing on the real property to within six months of that date was being exercised.
The closing has not taken place.
The following paragraphs of the contract for the sale of the real property proved to be provisions pertinent to this hearing:
 "3. CLOSING. The closing of title shall take place on the third anniversary of the date of this Agreement at 10:00 A.M. at the offices of Badger, Fisher and Cohen, 49 West Putnam Avenue, Greenwich, Connecticut; or at such time and place as all parties subsequently agree upon in writing. In the event that the Buyer shall be unable to close on the aforementioned date, then he shall be charged on a per diem basis a sum equal to any and all cost incurred by the seller as a result of the delay in closing, but in no event shall Buyer be responsible for CT Page 5671 consequential damages. The Seller shall have the right to accelerate the closing by giving six months prior written notice to the Buyer at any time prior to the third anniversary (sic) date of this Agreement. In the event that Grassi Oldsmobile-Cadillac, Inc. has exercised its right to sell certain automobile dealership assets pursuant to an Agreement of Sale of Assets (Asset Agreement) of even date herewith, * closing of title hereunder shall take place simultaneously upon closing under the Asset Agreement."
(The asterisk insertion reads "*, and all conditions to closing under the Asset Agreement have been satisfied,").
"9. REPRESENTATIONS AND CONDITION OF PREMISES.
 The Buyer agrees and acknowledges that * he has inspected the premises and that he is fully satisfied with the physical condition thereof, and that neither the Seller nor any representative of the Seller, has made any representation upon which the Buyer relies, with respect to the condition of the property covered by this Agreement except as hereinafter expressly set forth; and the Buyer covenants that he will accept the premises in substantially their present condition, reasonable wear and tear accepted, except as otherwise set forth herein."
(The asterisk insertion reads "*, subject to the provisions of paragraph 21,").
 "11. DEFAULT. If the Buyer fails in the performance of any of the terms hereof, the seller shall have the option of canceling This Contract, as and for the Seller's sole and exclusive remedy, retaining as liquidated damages any and all sums previously paid hereunder to be applied against any and all actual damages sustained by the Seller as a result of the Buyer's failure to perform, or pursuing such other remedies which he may have at law and equity."
"21. ENVIRONMENTAL MATTERS.
 (a) Purchaser shall have the right, but not the obligation at Purchaser's expense, prior to Closing, to make such physical inspections of the Premises and to perform whatever other tests, studies, searches or investigations ("Environmental Tests") as it may elect to perform to determine the extent of the presence of petroleum, petroleum products and derivatives or hazardous wastes. Seller agrees to give Purchaser and Purchaser's agents and consultants access to the Premises, upon reasonable prior notice, and to fully cooperate with respect to Purchaser's performance of the Environmental Tests. Purchaser shall provide Seller with a copy of the results CT Page 5672 of the Environmental Tests upon completion.
 (b) In the event that, as a result of the performance of the Environmental Tests, Purchaser's mortgage lender ("Lender") requires the performance of such remedial work, Purchaser shall undertake to have such work performed and the cost thereof shall be allocated as follows: The first $400,000.00 of all such cost shall be borne by Purchaser and all costs in excess of $400,000.00 shall be borne by Seller. Seller shall, prior to Closing, provide Purchaser and Purchaser's representatives and consultants access to the Premises, upon prior written notice, in order to permit such remedial work to take place provided that such work shall not materially interfere with the conduct of Seller's business. Seller shall have the right to have such remedial work undertaken by a consultant and/or contractors of Seller's selection, provided that such consultant and/or contractors and the remedial work to be performed is acceptable to Lender.
 (c) Closing hereunder shall take place in accordance with the provisions of paragraph 3, notwithstanding the provisions of this paragraph 21, subject nevertheless (1) to the completion of the Environmental Tests and (2) to any requirements of Lender regarding the performance of the remedial work referred to in paragraph (b) of this paragraph 21. In the event that closing shall take place before the completion of, or prior to payment for, such remedial work, each party shall place in escrow a sum sufficient to pay in full for each such parties' respective share of such cost, such sums to be held jointly in an escrow account by the attorneys for the Purchaser and Seller, respectively; provided that, in no event shall Purchaser be required to close until such time as all issues raised by the Environmental Tests have been resolved to the satisfaction of Lender. The provisions of this paragraph shall Survive Closing of title hereunder."
The plaintiff claims that paragraph 21(c) of the agreement established a condition precedent to any closing under the contract and that, since the condition did not occur, he is entitled to a return of his downpayment of $1,000,000.00 together with interest.
The defendants claim that the plaintiff has breached the agreement by his failure to act in good faith and fair dealing under the agreement and seek damages.
The testimony and exhibits presented at the hearing indicate the following course of events.
The defendant Grassi has owned the property since the early 1970's and has operated, through the defendant corporation, a CT Page 5673 Cadillac and Oldsmobile sales agency at that place.
In 1986, there occurred an overflow oil spill from a waste oil collection tank then located on the property. Mr. Grassi advised Mr. Brant of this during the negotiations for the contract.
After the contract was signed in November 1989, the plaintiff engaged an environmental consulting firm, HRP Associates, Inc., to perform environmental testing. HRP began inspection in December, 1990 and continued its examination of the property into January, 1990.
Mr. Grassi, on January 25, 1990, indicated his election to exercise the option to sell the Cadillac dealership and advance the closing. This meant that the closing would take place in late July, 1990.
HRP submitted a report on March 8, 1990, indicating significant ground water contamination and noting that the former waste oil tank was the possible source of that contamination. Because it could not recommend a plan to remedy the problem until the extent and source of the contamination were better defined, it recommended further testing.
The plaintiff did authorize further testing, although the evidence is not clear as to the timing of that authorization.
HRP undertook a second round of tests in June, 1990. HRP submitted a report, on July 2, 1990, indicating, "the source of ground water contamination is likely located in the area of the historic waste oil tank grave."
The evidence demonstrates that the plaintiff Brant had, in the past, dealt with the bank then known as the Connecticut Bank and Trust Company ("CBT") as a source of funding for various ventures. CBT had advanced the funds for the downpayment on the present contract and it was to CBT that the plaintiff was looking for mortgage funding on this purchase.
The Brant organization, primarily through J. Allen Kosowsky, submitted proposals for financing several projects contemplated for the site. Initially Mr. Brant had planned to construct an office complex on the site retaining a showroom for Cadillac automobiles and certain classic cars while transferring the repair and maintenance facilities to another site. When that proved not feasible, a revised proposal to improve the existing uses was submitted. In conjunction with these discussions, the HRP reports were made available to the bank.
By a letter dated August 22, 1990, Patricia Van de Velde, the CT Page 5674 CBT loan officer with whom the Brant organization had been dealing, wrote that the financing which the plaintiff was seeking would not then be forthcoming. She wrote: "The presence of subsurface and groundwater contamination together with the DEP's highly sensitive classification of the site's groundwater make a complete remediation essential before we can proceed. At such time as a remediation plan has been recommended, quantified and implemented, we will be pleased to reconsider this financing."
In September, 1990, HRP, having done additional sampling, reported the possibility that the ground water contamination might be caused by an off-site source. At a meeting with Peter Brant on September 13, 1990, Mr. Kosowsky noted that "Peter said to hold the line on environmental and take the position that deal should be canceled."
Nonetheless, Mr. Kosowsky testified, Mr. Brant still wanted to proceed with the purchase. Mr. Brant's group submitted to the bank the September HRP report, which had no remediation recommendation, together with a report prepared by Mr. Grassi's environmental consultant, Environmental Assurance, Inc., which had a recommended remediation plan. On October 12, 1990, Ms. Van de Velde wrote that she was awaiting the receipt of HRP's conclusions and recommendations, indicating that HRP's officer, one Chapman, stated that Mr. Kosowsky had ordered the remediation recommendation and cost estimates. She also indicated great confidence in HRP as an environmental consultant.
No such report was forthcoming and on January, 1991, Ms. Van de Velde wrote another letter declining the loan and closing the file on the application.
HRP tested the ground water in January and February, 1991 and issued a report on February 15, 1991 suggesting three sources of water contamination: the former waste oil tank; an upgradient off-site source such as a dry cleaning business formerly located at 37 West Putnam Avenue; or a combination of both. At the same time in February, 1991, Mr. Grassi's consultant, EnviroShield, part of the Environmental Assurance, Inc. organization, made a clean up proposal calling for contaminated soil removal and air sweeping the ground water, with an estimated cost of at most $150,000.00.
These reports were submitted to the bank. Undoubtedly, the bank was concerned about the effect of the contamination under the "Superlien" statute if it were to take back a mortgage. For example, in a letter from Thomas Lux, who appeared to be the CBT officer in Hartford learned in environmental problems, written on February 27, 1991, to John A. Stanley, the loan officer succeeding Ms. Van de Velde on the Brant account, Lux stated CT Page 5675 "What was presented seems to indicate that this site has a troublesome level of contamination. I would not mortgage this site unless and until we determine the source of the contamination and took steps to remediate it. With volatile organic solvents such as were disclosed here, you may be looking at a water sweep operation that may take 5-10 years to complete."
In March, 1991, Mr. Stanley, on behalf of CBT, wrote that "[the] reports indicate a level of contamination above the governmental guidelines. It does not appear, however, that the full scope of the problem has been determined. Until that determination is reached along with the costs and details of a remediation plan, CBT is unable to consider your financing requests."
Both Ms. Van de Velde and Mr. Stanley testified that the bank wanted a clean site before advancing any mortgage financing on the property. However, the correspondence certainly would indicate that a detailed remediation plan would be adequate to satisfy the bank's concerns.
During the Spring, the Brant organization went to other lenders both directly to the Bank of New York and GMAC and through a mortgage broker with other possible lenders. GMAC indicated a willingness to advance up to $1,000,000.00, but not to the amount required by Mr. Brant. It is unclear from the testimony why no loan was agreed to by any other potential lender.
After demanding return of his downpayment with interest the plaintiff commenced this action in September, 1991.
It is the plaintiff's contention that CBT would not provide mortgage financing until a remediation plan acceptable to CBT was implemented and led to a clean site. The plaintiff claims that he was unable to overcome the initial hurdle of procuring an acceptable remediation plan because HRP — the consultant upon which CBT relied — was unable to identify the source of the contamination. The plaintiff therefore claims that, although there was no express mortgage condition in the agreement, Section 21(c) of the agreement must be read to mean that if the plaintiff's mortgage lender were so concerned about the environmental condition of the property that it would not close the loan — either because it was not satisfied with the results of the remedial work or because no acceptable remediation plan was proposed — Brant was not obligated to consummate the transaction. The defendants assert that no acceptable remediation plan was proposed by HRP because the plaintiff would not implement the proposals suggested by HRP or the defendants' consultants, although under Section 21(b) of the agreement, he was required to expend up to $400,000.00 to have the remedial work done. They assert that he CT Page 5676 had it under his control to at least ascertain if the source of the contamination was an upgrade off-site location by isolating the site of the oil tank grave through soil removal.
To support his contention that conducting any off-site investigation was not feasible, the plaintiff has produced an October 31, 1990 letter from Mr. Grassi's attorney, Ira Greenhill, to Mr. Brant's attorney, Bruce Cohen, stating: "It is my belief, which is shared by Mr. Grassi, that off-site investigation as a condition of providing a mortgage could not possibly be required by a mortgage lender due to its impractical nature. If CBT takes that position, we strongly suggest that you apply for financing to other institutions."
The defendants, however, have noted that the immediately adjacent upgrade off-site location was property, as Paragraph 3 of the Agreement indicated, owned by the plaintiff's attorney. There was no evidence presented as to whether or not testing on that property or its upgrade perimeter could have eliminated an off-site location as the source.
While the court appreciates that for the issuance of a prejudgment remedy the standard of proof is probable cause, nonetheless due process requires that the probability be clearly shown.
What has been shown is that CBT would not grant a mortgage loan on this property at least until an acceptable and workable environmental remediation plan had been developed. It also appears clear that CBT, or at least the bank officers who testified, would accept such a plan only from the plaintiff's environmental consultant, HRP. It is also clear that the parties are at variance as to the significance and meaning of the February 15, 1991 report by HRP, especially the significance of the recommendation concerning soil excavation.
In all of its reports, HRP said the most likely source of water contamination was the former waste oil site but never indicated how or if that source could be eliminated. That site was, according to Mr. Grassi's testimony located in the driveway between the subject property (at 53-55 West Putnam Avenue) and the upgradient property owned by the plaintiff's attorney (at 49 West Putnam Avenue). The most likely source suggested by the reports for any possible off-site source of contamination was the property at 37 West Putnam Avenue where a dry cleaning business was formerly located and up grade from that owned by the attorney. The report of February, 1991, did recommend the installation of off-site upgradient wells to ascertain if the contamination source might be from any off-site property upgrade. What is not clearly shown is why the plaintiff did not proceed further with his own consultant's recommendations. What is not clearly shown is what the consultant meant by its recommendations in February, 1991 CT Page 5677 and whether wells on the plaintiff's attorney's property would resolve the off-site source problem.
While there might be evidence adduced at the trial that will resolve these questions, such evidence was not presented at the probable cause hearing to the extent that this court can say that the condition precedent to the closing, if any, contained in Section 21(c) of the agreement occurred because of circumstances beyond the control of the plaintiff or in spite of the plaintiff's obligations under Section 21(b) of the agreement.
Under these circumstances, the court cannot grant the plaintiff's motion for a prejudgment attachment of properties of the defendant, Jack D. Grassi, to secure a probable judgment in his favor.
The defendant, Jack D. Grassi, asserted claims for damages flowing from the alleged breach of the contracts by the plaintiff. The defendant presented no evidence in support of his claim for actual damages beside his assertions.
Moreover, the contract is peculiar in that it provides the down-payment of $1,000,000.00, which is more than 20 percent of the purchase price may be held as liquidated damages. This, unexplained, exceeds the 10 percent amount which our Supreme Court has held as reasonably averting a claim of penalty.
Thus, the court cannot find that any evidence has been presented by the defendant which would warrant a prejudgment remedy in favor of the defendant and his motion is denied.
The motion for prejudgment remedy by each party is denied.